**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STEVEN CHURCH, *et al.*,<br>　　　Plaintiffs,<br>　　v.<br>JOSEPH R. BIDEN, in his official capacity as<br>President of the United States, *et al.*,<br>　　　Defendants. | Civil Action No. 21-2815 (CKK) |

**MEMORANDUM OPINION**
(November 8, 2021)

The plaintiffs in this case include eighteen federal civilian employees[1] and two active-duty Marines[2] (collectively, "Plaintiffs").  By virtue of their federal civilian and military employment, Plaintiffs are subject to the recent COVID-19 vaccine mandates imposed under President Joseph R. Biden's Executive Order 14043 and Secretary of Defense Lloyd Austin's August 24, 2021 order for the vaccination of military personnel.  Plaintiffs now challenge these vaccine mandates on constitutional and statutory grounds and request emergency injunctive relief preventing their enforcement.

Plaintiffs' "extraordinary" request for immediate injunctive relief is not merited.  At this early stage of the proceedings, the record reflects that *each* Plaintiff has requested an exemption to the very COVID-19 vaccine mandates they challenge.  These exemption requests all remain pending, and during their pendency, no Plaintiff faces disciplinary action for refusing the COVID-19 vaccine.  Plaintiffs, therefore, come before this Court complaining of a compulsory inoculation they may never need to take, and of adverse employment actions they may never

---

[1] The "Federal Employee Plaintiffs" are: Steven Church, Lesley Church, Alma Gonzalez, Dynika Barnwell, Douglas Czerwinski, Jason Coffey, Joshua Schmidt, Melina Royer, Tamika Walls, Jaime Espitia, Somer Stephens, Alex Berne, Alan Camp, Stephanie Perrotta, Christopher Axtell, Grace Brown, Kristofor Hallfrisch, and Dorothy Morgan.

[2] The "Service Member Plaintiffs" are: First Lieutenant Andrew Soto and Corporal Christopher Hall.

experience.  This uncertainty weighs decisively against the ripeness of Plaintiffs' claims and the irreparability of their purported injuries.  Emergency injunctive relief is not appropriate under these circumstances.  Accordingly, upon consideration of the pleadings, the relevant legal authorities, and the record as a whole,[3] the Court **DENIES** Plaintiffs' [5] Emergency Application for a Temporary Restraining Order and Motion for Preliminary Injunction.

## I.   BACKGROUND

### A.  COVID-19 Pandemic & Vaccine Development

Coronavirus disease ("COVID-19") is an infectious disease caused by the SARS-CoV-2 virus.[4]  Spread principally by "exposure to respiratory fluids," the "initial presentation of a [COVID-19] infection ranges from no symptoms at all (asymptomatic) to severe illness and death; and even after recovery, various long-term health problems may linger." *Klaasen v. Trustees of Ind. Univ.*, --- F. Supp. 3d ---, 2021 WL 3073926, at *2 (N.D. Ind. July 18, 2021) (internal citations omitted); *see* Defs.' Opp'n Ex. 9, Decl. of Colonel Tonya Rans ("Rans Decl.") ¶ 7, ECF No. 13-9.[5] Because the virus causing COVID-19 can "be easily transmitted to others prior to symptom

---

[3] This Memorandum Opinion focuses on the following documents:
- Verified Complaint for Declaratory and Injunctive Relief ("Compl."), ECF No. 1;
- Plaintiffs' Memorandum of Law in Support of Plaintiffs' Emergency Application for Temporary Restraining Order and Preliminary Injunction ("Pls.' Mot."), ECF No. 5-1;
- Defendants' Opposition to Emergency Application for Temporary Restraining Order and Preliminary Injunction ("Defs.' Opp'n"), ECF No. 13; and
- Plaintiffs' Memorandum of Law in Reply to Defendants' Opposition to Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction ("Pls.' Reply"), ECF No. 14.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

[4]   World Health Org., *Coronavirus disease (COVID-19)*, https://www.who.int/health-topics/coronavirus#tab=tab_1 (last visited Nov. 8, 2021).

[5]   *See also* CDC, *Scientific Brief: SARS-CoV2 Transmission*, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html (last visited Nov. 8, 2021); CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Nov. 8, 2021); Neal M. Dixit et al., *Post-Acute COVID-19 Syndrome and the Cardiovascular System: What is Known?*, 5 Am. Heart. J. Plus. 100025 (May 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8223036/.

development," it can "infect significant numbers before being identified." Rans Decl. ¶ 9. In recent months, a mutation of the SARS-CoV-2 virus known as the "Delta" variant has become the dominant strain of the virus; it is twice as contagious as previous variants. *Id.* ¶ 5.[6] To date, approximately 46 million cases of COVID-19 have been reported in the United States; the disease has claimed the lives of more than 751,000 Americans.[7]

As another federal district court summarized, "COVID-19 caught the world unaware. Initially, there were no vaccines or treatments[.]" *Klaassen*, 2021 WL 3073926, at *8. Shortly after then-President Donald J. Trump declared a national emergency on March 13, 2020, *see* 85 Fed. Reg. 15,337 (Mar. 13, 2020), the Secretary of the U.S. Department of Health and Human Services ("HHS") determined that "circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic," *see* 85 Fed. Reg. 18,250, 18,250–51 (Apr. 1, 2020). In such circumstances, the U.S. Food and Drug Administration ("FDA") may issue an "emergency use authorization" ("EUA") for FDA-regulated products "intended for use" in responding to the emergency, before such products receive FDA "approval." *See* 21 U.S.C. § 360bbb-3(a)(1). In October 2020, the FDA issued guidance to vaccine developers, "outlining [the FDA's] expectations for vaccine sponsors," including the "scientific data and information" that would be required to obtain an EUA.[8]

---

[6] *See also* CDC, *What We Know About the Science* (Aug. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.

[7] *See* CDC, *COVID-19 Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Nov. 8, 2021).

[8] *See* FDA, *Coronavirus (COVID-19) CBER-Regulated Biologics*, *Emergency Use Authorization*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics (last visited Nov. 8, 2021). The latest version of the FDA's Industry Guidance was issued on May 25, 2021, superseding the original guidance issued in October 2020 and a second iteration dated February 22, 2021. *See* Emergency Use Authorization for Vaccines to Prevent COVID-19, Guidance for Industry (May 25, 2021), https://www.fda.gov/media/142749/download.

In late 2020 and early 2021, the FDA issued EUAs for COVID-19 vaccines developed by three companies—Pfizer BioNTech, Moderna, and Johnson & Johnson.[9]  On August 23, 2021, the FDA approved the vaccine created by Pfizer BioNTech, which would be marketed as "Comirnaty," for "the prevention of COVID-19 disease in individuals 16 years of age and older."[10]

## B. Vaccine Mandates

### 1. Federal Employee Vaccine Mandate

On September 9, 2021, President Joseph R. Biden issued Executive Order 14043, Requiring Coronavirus Disease 2019 Vaccination for Federal Employees.  *See* Exec. Order 14043, 86 Fed. Reg. 50,989 (Sept. 9, 2021) (hereinafter "Executive Order 14043" or "Federal Employee Vaccine Mandate").  Noting that the "Delta variant" of COVID-19 is "highly contagious and has led to a rapid rise in cases and hospitalizations," and that "COVID-19 vaccines are widely available in the United States," Executive Order 14043 concludes that it is "essential that Federal employees take all available steps to protect themselves and avoid spreading COVID-19 to their co-workers and members of the public.  The [Centers for Disease Control ("CDC")] has found that the best way to do so is to be vaccinated."  *Id.* § 1.  Accordingly, "[e]ach agency" is instructed to "implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its Federal employees, with exceptions only as required by law."  *Id.* § 2.

---

[9] *See* FDA, *Moderna COVID-19 Vaccine*, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/moderna-covid-19-vaccine (last visited Nov 8, 2021); FDA, *Comirnaty and Pfizer-BioNTech COVID-19 Vaccine*, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/comirnaty-and-pfizer-biontech-covid-19-vaccine (last visited Nov. 8, 2021); FDA, *Janssen COVID-19 Vaccine*, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/janssen-covid-19-vaccine (last visited Nov. 8, 2021).

[10] *See* FDA News Release, FDA Approves First COVID-19 Vaccine (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine.

Executive Order 14043 also directs the Safer Federal Workforce Task Force ("Task Force")[11] to "issue guidance within 7 days . . . on agency implementation of this requirement for all agencies covered by this order." *Id.* The resulting guidance directs that "[f]ederal employees need to be fully vaccinated by November 22, 2021." *See* Safer Federal Workforce, FAQs, Vaccinations, https://perma.cc/YH2Z-CMDJ ("Task Force Vaccine Guidance"). Federal employees are "considered fully vaccinated for COVID-19 2 weeks after they have received the requisite number of doses of a COVID-19 vaccine," meaning that federal employees must receive their "last dose of the vaccine by *no later than November 8, 2021* to meet the November 22, 2021 deadline to be fully vaccinated."[12] *Id.* (emphasis added). Employees who fail to comply with this deadline and "have neither received an exception nor have an exception request under consideration" are "subject to discipline, up to and including termination or removal." *Id.*

The Task Force Vaccine Guidance recognizes that certain federal employees may be eligible for an exception to the vaccine requirement in "limited circumstances" in which "the law requires an exception":

> [A]n agency may be required to provide a reasonable accommodation to employees who communicate to the agency that they are not vaccinated against COVID-19 because of a disability or because of a sincerely held religious belief, practice, or observance. Determining whether an exception is legally required will include consideration of factors such as the basis for the claim; the nature of the employee's job responsibilities; and the reasonably foreseeable effects on the agency's operations, including protecting other agency employees and the public from COVID-19. Because such assessments will be fact- and context-dependent, agencies are

---

[11] Established by Executive Order 13991 on January 20, 2021, the Task Force is comprised of executive agency officials and charged with "provid[ing] ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic." Executive Order 13991 § 4(e), 86 Fed. Reg. 7,045, 7,046 (Jan. 20, 2021).

[12] Recipients of the two-dose Pfizer-BioNTech or Moderna COVID-19 vaccine must receive their second dose by no later than November 8, 2021. Recipients of the one-dose Johnson & Johnson vaccine would have to receive their only dose by no later than November 8, 2021 to be considered "fully vaccinated" by November 22, 2021. *See* Task Force Vaccine Guidance.

> encouraged to consult their offices of general counsel with questions
> related to assessing and implementing any such requested
> accommodations.

Task Force Vaccine Guidance.  As of October 29, 2021, the Guidance provides a "template" for

employees to submit a request for a religious exception to the vaccine requirement, but notes that

agencies may ask for "additional information" to determine whether the employee is entitled to

any accommodation.[13]   The Guidance directs agencies to set a date by which employees can

request exceptions, but also allows employees to "submit requests for an exception after the date

established by the agency."  *Id.*  Defendants note that an employee "who requests an exception

will not be subject to discipline while the request is under consideration."  Defs.' Opp'n at 5; *see*

Task Force Vaccine Guidance ("Agencies may initiate the enforcement process as soon as

November 9, 2021, for employees who fail to submit documentation to show that they have

completed receiving required vaccination dose(s) by November 8, *as long as those employees have*

*not received an exception and the agency is not considering an exception request* from the

employee." (emphasis added)).   If an employee's request for a religious exception is denied, then

the employee must receive "their first (or, if a one-dose series, only), dose within two weeks of the

final determination to deny the accommodation."  Task Force Vaccine Guidance.

### 2.  Department of Defense ("DoD") Vaccine Mandate

Emphasizing the need for a "healthy and ready force" to "defend this Nation," Secretary

of Defense Lloyd Austin announced on August 9, 2021 that COVID-19 vaccines would be added

to the list of mandatory vaccines required for all service members "by no later than mid-September,

---

[13] *See* Safer Federal Workforce, Template for Request for Religious Exception to the COVID-19 Vaccination Requirement, https://perma.cc/6A6D-EPH9 ("Religious Exception Template").

or immediately upon [FDA] licensure, whichever comes first."[14] Mem. for Dep't of Def. Employees (Aug. 9, 2021), https://perma.cc/H5G8-T62L.

After the FDA announced its approval of Pfizer BioNTech's COVID-19 vaccine on August 23, 2021,[15] Secretary Austin directed the "Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces under DoD authority or on active duty or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19." Mem. for Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency and DoD Field Activity Directors (Aug. 24, 2021), https://perma.cc/CV3J-EM3M ("DoD Vaccine Mandate"). Secretary Austin's directive indicates that "[m]andatory vaccination against COVID-19 will only use COVID-19 vaccines that receive full licensure from the [FDA] in accordance with FDA-approved labeling and guidance," but also notes that service members "voluntarily immunized with a COVID-19 vaccine under FDA Emergency Use Authorization" are considered fully vaccinated. *Id.*

A subsequent directive issued by the Secretary of the Navy required all "[a]ctive duty Sailors and Marines" to "become fully vaccinated by November 28, 2021." Defs.' Opp'n Ex. 4, Decl. of David J. Furness ("Furness Decl.") ¶ 4, ECF No. 13-4. The Commandant of the Marine Corps also released "service-specific guidance via a separate administrative message" on September 1, 2021, which "outlines Marine Corps policy concerning the mandatory vaccination of USMC service members[.]"[16] *Id.* ¶ 5. Marines may seek exemptions to the vaccine mandate for a medical or "administrative" reason—the latter of which "may be granted for reasons such as

---

[14] *See* DoD Instruction 6205.02, DoD Immunization Program, https://perma.cc/ZU4H-CBA3.

[15] *See* Press Release, FDA, FDA Approve First COVID-19 Vaccine (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine.

[16] *See* Marine Corps Administrative Message 462/21 (Sept. 1, 2021), https://perma.cc/Z7GG-PQD2 ("MARADMIN 462/21").

pending separation or retirement, permanent change of station, emergency leave, and religious accommodation." *Id.* ¶ 12.

The Marine Corps' policy concerning requests for "the accommodation of religious practices generally, including immunizations, is outlined in Marine Corps Order ("MCO") 1730.9." *Id.*  A service member requesting a religious accommodation must provide information regarding the nature of the accommodation requested, the duration of the request, the religious or sincerely held spiritual basis for the request, and the faith group or belief system identified with the request." *Id.* ¶ 12(a); MCO 1730.9 ¶ 4.a.(3).  Adjudication of exemption requests based on religion must be completed on a "case-by-case basis," but may also take into account the "individual and the cumulative effects of granting similar religious accommodation requests on the necessary elements of mission accomplishment," as well as "any adverse health and safety impacts." Furness Decl. ¶ 12(b); MCO 1730.9 ¶¶ 4.b.(2); 4.b.(3)(b).   If the request for "religious accommodation for immunization is disapproved, the service member has the right to request an appeal to the Commandant of the Marine Corps."  Furness Decl. ¶ 12(b); MCO 1730.9 ¶¶ 4.c.(1).

Defendants indicate that "[n]o disciplinary or administrative action will be initiated while a request for an exemption for religious accommodation is pending."  Furness Decl. ¶ 12(a) n.7. A service member who ultimately refuses vaccination and does not have an approved exemption may be subject to discipline and adverse administrative action, which may be initiated only "at the special court martial convening authority level." *See* MARADMIN 462/21, ¶ 3.*l*; Furness Decl. ¶ 5 ("The authority to dispose of offenses arising from COVID-19 vaccine refusals is withheld to the general court-martial convening authority, although the special court-martial convening authority may issue administrative counseling. . . . Withholding this authority from lower ranking

commanding officers and commanders precludes administrative separation or disciplinary action without elevated review and direction of a general officer.").

## C. Plaintiffs' Factual Background

Plaintiffs are eighteen civilian employees of various executive agencies ("Federal Employee Plaintiffs"), Compl. ¶¶ 5–22, and two active-duty members of the United States Marine Corps ("Service Member Plaintiffs"), *id.* ¶¶ 23–24.

Each Federal Employee Plaintiff alleges that he or she submitted a request for a religious exception to the mandatory vaccination provision of Executive Order 14043 on the basis that he or she is a "devout Christian who cannot in morality receive the vaccine without compromising [his or her] closely held religious beliefs." [17] *Id.* ¶¶ 5–22, 60–77. Plaintiff Kristofor Hallfrisch's request for a religious exemption to the vaccine requirement was granted. *Id.* ¶¶ 21, 62. The religious exception requests by the other seventeen Federal Employee Plaintiffs remain pending.[18] *See id.* ¶¶ 60–61, 63–77.

The Service Member Plaintiffs each submitted a request for a religious accommodation exempting them from the requirement to be fully vaccinated by November 28, 2021. *Id.* ¶¶ 78, 79; Defs.' Opp'n Ex. 5, Decl. of Jeremy M. Beaven ("Beaven Decl.") ¶ 5, ECF No. 13-5; Defs.' Opp'n Ex. 6, Decl. of William M. Jurney ("Jurney Decl.") ¶ 6, ECF No. 13-6; Defs.' Opp'n Ex. 7, Decl. of Kerry A. Cerny ("Cerny Decl.") ¶ 4, ECF No. 13-7. Both Service Member Plaintiffs submitted requests for religious accommodations to the Deputy Commandant for Manpower and

---

[17] Health care professionals employed by the Department of Veterans Affairs, including Plaintiff Stephanie Perrotta, are also subject to a separate mandate, VA Notice 22-01, which required compliance by October 8, 2021. *See* VA Notice 22-01, Mandatory Coronavirus Disease 2019 (COVID-19) Vaccination Program for VA Employees (Oct. 4, 2021), https://perma.cc/VH9Z-TQT4. VA Notice 22-01 permits requests for religious exceptions, *see* VA Notice 22-01 at 3, 4, 9–10, and provides that employees will not be disciplined while a request is pending, *see id.* at 10.

[18] Defendants indicate that the request allegedly submitted by Plaintiff Joshua Schmidt has not been located by his employing agency, the U.S. Custom and Border Patrol. *See* Defs.' Opp'n at 10 n.5

Reserve Affairs.  Beaven Decl. ¶ 5; Jurney Decl. ¶ 7.  Both requests were denied and both Service Member Plaintiffs were informed of their right to appeal the denials to the Commandant of the Marine Corps.  *See* Compl. ¶¶ 78, 79; Beaven Decl. ¶ 5; Jurney Decl. ¶ 7.  Corporal Christopher Hall submitted his appeal on October 6, 2021.  Beaven Decl. ¶ 6.  First Lieutenant Andrew Soto submitted his appeal on November 1, 2021.  Cerny Decl. ¶ 6.  Both appeals are currently pending, *see* Beaven Decl. ¶ 6; Cerny Decl. ¶ 6, and both Service Member Plaintiffs are afforded a "temporary administrative exemption" to the vaccination requirement while their religious accommodation requests are pending appeal, Beaven Decl. ¶ 5; Jurney Decl. ¶ 9.  No "adverse administrative or disciplinary action" has been initiated against either Service Member Plaintiff. Beaven Decl. ¶ 8; Jurney Decl. ¶ 9.

**D.  Procedural Posture**

Plaintiffs filed their four-count Complaint in this action on October 24, 2021.  *See* Compl. Therein, Plaintiffs claim that the mandatory vaccination provisions contained in Executive Order 14043 and in the DoD Vaccine Mandate (collectively, the "Vaccine Mandates") (1) infringe on their First Amendment right to the free exercise of religion, Compl. ¶¶ 156–169; (2) contravene the Religious Freedom Restoration Act ("RFRA") by "substantially burdening" their "sincerely held religious beliefs" which compel them to abstain from receiving any COVID-19 vaccine, *id.* ¶¶ 170–179; (3) violate their Fifth Amendment Right to Equal Protection, *id.* ¶¶ 190–202; and (4) violate the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3 *et seq.*, by failing to provide them the "option to accept or refuse administration" of a product available under emergency-use authorization (Count IV, Compl. ¶¶ 203–220).[19]

---

[19] Special Agent Hallfrisch, a State Department employee whose request for a religious exemption to the mandatory vaccination requirement was approved, asserts only a claim under the FDCA (Count IV), and does not assert claims under the First Amendment Free Exercise Clause, the Fifth Amendment Equal Protection Clause, or RFRA.  *See* Pls.' Mot. at 19 n.31.

On October 27, 2021, Plaintiffs filed an [5] Emergency Application for Temporary Restraining Order and Motion for Preliminary Injunction ("TRO/PI Motion"), seeking to "enjoin the enforcement" of the Vaccine Mandates.  Pls.' Mot. at 1.  Plaintiffs assert that granting such relief would "automatically exempt on religious grounds all Christians from the Vaccine Mandate[s]."  Hr'g Tr. 4:9–17, ECF No. 10.  The scope of Plaintiffs' requested injunctive relief is not entirely clear from their TRO/PI Motion, as Plaintiffs did not submit a proposed order with their pleading.  *See* LCvR 7(c).  However, in their Complaint, Plaintiffs indicate that they seek an order enjoining Defendants from "enforcing" or "requiring compliance" with the Vaccine Mandates;  in their words, Plaintiffs' requested relief would include an order requiring Defendants to (1) "comply" with the EUA provisions of the FCDA; (2) "cease in their refusal to consider, evaluate, or accept Plaintiffs' requests" for religious exemptions; (3) "grant Plaintiffs' requests for religious exemption from the Vaccine Mandate[s]"; and (4) "cease any actions arising from or connected to the Department of Defense . . . including current and ongoing punishment and threatening to dishonorably discharge, court martial, and impose other life-altering disciplinary actions."  Compl., Prayer for Relief ¶¶ A, B.

Upon receipt of Plaintiffs' TRO/PI Motion, the Court held a teleconference with the parties on October 27, 2021 to discuss a briefing schedule.  *See* Minute Order (Oct. 27, 2021).  During the teleconference, counsel for Defendants argued that the "speculative and hypothetical injuries" Plaintiffs asserted did not warrant an expedited briefing schedule or require a decision by the Court before the November 8, 2021 deadline applicable to federal civilian employees.  *See* Hr'g Tr. 7:21–9:14; *see supra* Section I(B)(1).  Specifically, Defendants noted that the policies guiding agencies' consideration of religious exception requests precluded them from terminating any employees with a pending request.  *See* Hr'g Tr. 15:21–16:2 ("[P]ursuant to the policies we've just

been talking about, you know, these individuals are not going to be subject to discipline until such time as their religious request exemptions are denied, if that in fact happens."). In response, Plaintiffs' counsel argued that there is "nothing that Plaintiffs have that would indicate . . . that, absent being inoculated at least two weeks prior to the November 22 deadline, that they will in fact not face termination or that they will in fact not be subject to penalty." Hr'g Tr. 11:23–12:3. The Court observed that adopting Defendants' proposed schedule—pursuant to which the briefing would not be completed until *after* the applicable deadlines for employees to be "fully" vaccinated—would require the Court to determine "upfront" that Plaintiffs' TRO/PI Motion was not an "emergency." Hr'g Tr. 16:16–23. Because it was Defendants' position that employees would not be terminated while their exception requests were pending, the Court directed Defendants to file a notice setting forth those policies as "an assurance" that Plaintiffs would not be prejudiced by an extended briefing schedule beyond the vaccination compliance deadline and the dates set forth in the local rules. *See* Hr'g Tr. 24:7–22; LCvR 65.1.

Defendants filed their responsive [8] Notice on October 28, 2021, in which they cited provisions of the Task Force Vaccine Guidance for the proposition that "any civilian Plaintiff in this case who has already submitted a request for a religious exception to their employer . . . will not be subject to discipline *while that request is pending*, and will generally have two weeks from any final determination denying the request in which to begin the vaccination process." Notice ¶ 1, ECF No. 8. As to the Service Member Plaintiffs, Defendants noted that pursuant to the Marine Corps' administrative order, "[n]o Marine with a pending exemption request will be disciplined or separated while his request is pending." Notice ¶ 2. Defendants stated that they would notify the Court if any Plaintiff (in either category) received a final determination denying his or her exemption request during briefing of Plaintiffs' TRO/PI Motion.

Shortly thereafter, the Court issued a Minute Order, observing that Defendants' Notice "provide[d] no guarantee of what will happen to [P]laintiffs if their exception requests are denied and if they reach the point of being disciplined or terminated pending briefing" of Plaintiffs' TRO/PI Motion.  Minute Order (Oct. 28, 2021).  Because it was "not clear to the Court that [Defendants'] Notice sufficiently address[ed] the Court's concern that Plaintiffs will not be disciplined or terminated while briefing is completed pursuant to the extended schedule requested by Defendants," it appeared that "Plaintiffs may be prejudiced by the proposed extended briefing schedule."  *Id.*  The Court, therefore, directed Defendants to file a supplemental notice, indicating whether or not "they shall voluntarily agree that no plaintiff will be disciplined or terminated pending the Court's ruling on the TRO Motion."  *Id.*[20]  In the absence of such agreement, the Court indicated that it would enter a bifurcated briefing schedule that would allow for the Court to rule on Plaintiffs' TRO/PI Motion before the November 8, 2021 deadline.  *See id.*

In their [9] Supplemental Notice, filed on October 29, 2021, Defendants "offer[ed] the Court their assurance that (1) it is exceptionally unlikely that any Plaintiff will be terminated for failure to comply with the vaccination requirement during the pendency of the briefing schedule discussed at the conference, and (2) they will notify the Court promptly if a request for an exception is denied, prior to the imposition of any discipline for failure to comply with the vaccination

---

[20] To be clear, the Court's October 28, 2021 Minute Order did *not* grant Plaintiffs any injunctive relief. Rather, the Court sought to clarify Defendants' position regarding whether any Plaintiff would be disciplined or terminated while the parties completed briefing on Plaintiffs' TRO/PI Motion and Defendants' proposed motion to dismiss.  If, for example, a plaintiff's religious exception request had been denied on October 29, 2021, then it appeared—pursuant to the Task Force Vaccine Guidance cited by Defendants in their Notice—that the employee could potentially be in a position to be terminated as early as November 12, 2021 (before Defendants' proposed date of November 17, 2021 for submitting a consolidated opposition and motion to dismiss, *see* Hr'g Tr. 16:24–17:1; 19:15–21:5).  The purpose of the Court's request for information from Defendants was *not* to order any injunctive relief, but to determine an appropriate briefing schedule given Plaintiffs' identification of November 8, 2021 as the salient date for their requested injunctive relief.  *See* Pls.' Mot. at 7.

requirement." Suppl. Notice at 2.  But they indicated that they "could not agree to what is functionally a temporary restraining order pending the Court's decision on the motion seeking that same relief." *Id.*

Upon review of Defendants' Supplemental Notice, the Court concluded that it could not "disregard Plaintiffs' request for emergency relief and let the November 8, 2021 date pass" without ruling on Plaintiffs' TRO/PI Motion.  Order at 3, ECF No. 11.  In accordance with that Order, Defendants filed their Opposition on November 2, 2021, ECF No. 13, and Plaintiffs filed their Reply on November 3, 2021.

## II.   LEGAL STANDARD

"Temporary restraining orders and preliminary injunctions are 'extraordinary remed[ies] that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.'" *Lofton v. District of Columbia*, 7 F. Supp. 3d 117, 120 (D.D.C. 2013) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief.  *See, e.g.*, *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011) (applying preliminary injunction standard to district court decision denying motion for TRO and preliminary injunction); *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary injunction case law).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear

showing, carries the burden of persuasion." (internal quotation marks omitted)).   A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (internal quotation marks omitted)).   When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted).   "The four factors have typically been evaluated on a 'sliding scale.'"   *Davis*, 571 F.3d at 1291.   Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92.

It is unclear whether the United States Court of Appeals for the District of Columbia Circuit's ("D.C. Circuit") sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015).   Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"   *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)).   However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112.   In light of this ambiguity, the Court shall consider each of these factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome.

### III.   DISCUSSION

For the reasons set forth below, the Court concludes that Plaintiffs have failed to carry their burden of demonstrating that they are entitled to the extraordinary relief of a TRO or preliminary injunction.  Accordingly, the Court will **DENY** Plaintiffs' motion for a temporary restraining order and preliminary injunction

### A.  Substantial Likelihood of Success

In order to receive a TRO or a preliminary injunction, the moving "party must show, among other things, 'a substantial likelihood of success on the merits.'"  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)).   "The merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction."  *Elec. Priv. Info. Ctr. v. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (internal quotations and citations omitted).  Therefore, "[t]o establish likelihood of success on the merits, Plaintiffs must first establish that their claims are justiciable."  *Rai v. Biden*, No. 21-CV-863-TSC, 2021 WL 4439074, at *4 (D.D.C. Sept. 27, 2021) (citing *Food & Water Watch, Inc.*, 808 F.3d at 913).  A plaintiff who fails to show a substantial likelihood of jurisdiction is "not entitled to any relief, let alone the extraordinary remedy of a preliminary injunction."  *See Schindler Elevator Corp. v. WMATA*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020), *aff'd* No. 21-7008, 2021 WL 4928730 (D.C. Cir. Oct. 22, 2021).  As discussed below, Plaintiffs fail to show a likelihood of success that their claims are ripe for consideration by this Court.  For that reason, they are not entitled to injunctive relief at this time.

### 1.  Federal Employee Plaintiffs

The ripeness doctrine "generally deals with when a federal court can or should decide a case."  *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012).  Part of the ripeness doctrine is "subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter*

*alia* an injury-in-fact that is 'imminent' or 'certainly impending.'" *Id.* (citing *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427–28 (D.C. Cir.1996)). For a claim to be ripe under Article III, the plaintiff "must establish constitutional minima akin to that of standing by showing an injury-in-fact; allegations of possible future injury do not satisfy this requirement." *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999)). In other words, a case is not "constitutionally" ripe where it is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

The Federal Employee Plaintiffs have not shown a substantial likelihood that their claims are constitutionally ripe because they are "riddled with contingencies and speculation that impede judicial review." *Trump*, 141 S. Ct. at 535. The Federal Employee Plaintiffs claim that Defendants have "implemented processes" to enforce Executive Order 14043 that "preclude" federal employees from "submit[ting] religious accommodations." Pls.' Mot. at 9. But their own factual allegations belie this logic: each of the Federal Employee Plaintiffs alleges that he or she *has already submitted* an exemption request, and is awaiting a decision on the request.[21] *See* Compl. ¶¶ 60–61, 63–77.

The Federal Employee Plaintiffs' request for injunctive relief rests on their argument that mandatory vaccination against COVID-19 "burdens" their right to freely exercise their religion in violation of the First Amendment, RFRA, and the Fifth Amendment Equal Protection Clause by requiring them to choose (a) to be vaccinated in contravention of their "sincerely held religious

---

[21] With the exception of Special Agent Hallfrisch, whose request for a religious exemption to Executive Order 14043 was granted. *See* Compl. ¶¶ 21, 62.

beliefs"; or (b) to be terminated from their jobs.  *See* Pls.' Mot. at 13, 20; Pls.' Reply at 4.  They

also argue that Executive Order 14043 violates the FDCA, which requires that recipients of EUA-

authorized medical products be "informed" of the "option to accept or refuse administration of the

product."  Pls.' Mot. at 21 (citing 21 U.S.C. § 564(e)(1)(A)(ii)(III)).  But these arguments hinge

on "contingent future events that may not occur as anticipated, or indeed may not occur at all.'"

*Trump*, 141 S. Ct. at 535.  While the Federal Employee Plaintiffs' exemption requests are pending,

they are *not* required to be vaccinated and they are not "subject to discipline."  Defs.' Opp'n at 11;

*see also* Task Force Vaccine Guidance (indicating that agencies may not "initiate the enforcement

process" for employees who "have not received an exception" or from whom "the agency is not

considering an exception request").  And, in the event their exemption requests are ultimately

approved, they would not have to be vaccinated against COVID-19, meaning the injuries alleged

in this case would *never* occur.[22]

Moreover, as Defendants note, there is "no basis" on the current record "to assume" that

the Federal Employee Plaintiffs' exemption requests will be denied.  Defs.' Opp'n at 11. Special

Agent Hallfrisch's exemption request, for example, *was granted*.  Compl. ¶¶ 21, 62.  The Task

Force Vaccine Guidance directs agencies to consider requests on a case-by-case basis,   and

recently made available a template form for agencies to use to gather information pertaining to

exemption requests.  *See supra* Section I(B)(1); Religious Exception Template.  The Federal

Employee Plaintiffs' alleged injuries therefore rest on hypothetical predictions of the outcomes of

their exemption requests; but the "mere potential" for future injury is insufficient to "render an

---

[22] For example, the Federal Employee Plaintiffs' FDCA claim rests on the assumption that they will be in a position in which they are forced to receive an EUA vaccine (as opposed to an FDA "approved" vaccine) and that they will be denied the opportunity to be "informed" of the "option to accept or refuse administration of the product."  *See* Pls.' Mot. at 21.  But even this alleged harm is speculative because it is possible that their exemption requests will be granted, and they will not be required to receive a vaccine.

issue ripe for review." *Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 236 (D.C. Cir. 1988).

In sum, the Federal Employee Plaintiffs have failed to demonstrate that any injury is "imminent"

or "certainly impending," and therefore have not carried their burden of demonstrating a likelihood

that their claims create a ripe, justiciable controversy. *Am. Petrol*., 683 F.3d at 386.

The Federal Employee Plaintiffs have also failed to show that they are likely to succeed in

establishing that their claims are prudentially ripe. Even if a case is "constitutionally ripe," there

may still be "prudential reasons for refusing to exercise jurisdiction." *Id.* (quoting *Nat'l Park

Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). As a "prudential" matter, the ripeness

doctrine "'prevent[s] the courts, through avoidance of premature adjudication, from entangling

themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies

from judicial interference until an administrative decision has been formalized and its effects felt

in a concrete way by the challenging parties.'" *Nat'l Park Hosp.*, 538 U.S. at 807–08 (2003)

(quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149 (1967)). Assessing the "prudential

ripeness" of a case requires the Court to consider the "fitness of the issues for judicial decision"

and the "extent to which withholding a decision will cause hardship to the parties." *Am. Petrol*.,

683 F.3d at 387 (internal quotation marks omitted) (quoting *Abbott Labs.*, 387 U.S. at 149).

To determine whether an issue is "fit" for judicial review, the Court must consider whether

the issue presented "is purely legal, whether consideration of the issue would benefit from a more

concrete setting, and whether the agency's action is sufficiently final." *Friends of Animals v. Bur.

of Land Mgmt.*, 515 F. Supp. 3d 290, 301 (D.D.C. 2021) (internal quotation marks omitted)

(quoting *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir.

1990)). Even a "purely legal" issue is not "fit" for judicial review if "further factual development

would 'significantly advance [the Court's] ability to deal with the legal issues presented.'" *Nat'l*

*Park Hosp. Ass'n*, 538 U.S. at 812 (quoting *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 82 (1978)); *see also Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) ("[E]ven purely legal issues may be unfit for review.").

Here, the Federal Employee Plaintiffs' exemption requests are still under consideration by the agencies, and so are unfit for judicial review. To date, none of these Plaintiffs have been disciplined or terminated for electing not to be vaccinated against COVID-19, and they will not be while their requests are pending. *See* Compl. ¶¶ 60–61, 63–77; Task Force Vaccine Guidance. Further agency consideration is certain to occur before the Federal Employee Plaintiffs reach the point of termination (*e.g.*, their requests must first be denied).[23]   Moreover, this is plainly a case in which further development of the factual record is required to assess whether the Federal Employee Plaintiffs are entitled to relief for the harm they allege.  The absence of any factual record providing the basis for any denial of a religious accommodation request (if, in fact any plaintiff's request is denied) hamstrings the Court's ability to evaluate the merits of the Complaint's constitutional and statutory claims.

 Given that the outcome of the Federal Employee Plaintiffs' exemption requests is "currently unknown," the Federal Employee Plaintiffs also have not shown that delayed judicial review would cause them "immediate and significant" hardship. *Finca Santa Elena*, 873 F. Supp. 2d at 371 (citing *Am. Petrol.*, 683 F.3d at 389).   The Federal Employee Plaintiffs argue that "delayed review of the instant motion . . . would cause hardship to Plaintiffs—in fact, it would irreparably harm them as a deprivation of fundamental rights constitutes irreparable harm[.]"  Pls.'

---

[23] Even if their exemption requests are denied, the Task Force Vaccine Guidance directs agencies first to "work with employees to encourage their compliance" beginning with a "brief period of education and counseling (5 days)," then proceeding to a "short suspension" before ever "proposing a removal."  *See* Defs.' Opp'n at 14; Task Force Vaccine Guidance.  Even then, the Guidance indicates that "[u]nique operational needs of agencies and the circumstances affecting a particular employee may warrant a departure from these guidelines if necessary."  Task Force Vaccine Guidance.

Reply at 5.  For the reasons discussed *infra* Section III(B)(2), the Court disagrees with the articulation of the "irreparable harm" this group claims to face.  But the Federal Employee Plaintiffs also argue that judicial intervention is necessary at this time because the Federal Employee Vaccine Mandate "conflicts" with their "right to seek religious accommodation."  Pls.' Reply at 5.  As noted previously, Plaintiffs' own factual allegations contradict this argument; *every* Plaintiff has submitted a request for a religious accommodation.  Compl. ¶¶ 60–79, 63–77.  Where, as here, the "possibility that further [administrative] consideration will actually occur before implementation is not theoretical, but real," the Federal Employee Plaintiffs have not demonstrated that they will suffer immediate and significant hardship in the absence of immediate judicial intervention. *Wyo. Outdoor Council*, 165 F.3d at 50 (internal citation and quotation marks omitted); *see also Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003) ("Final agency action . . . is a crucial prerequisite to ripeness.").

Because the Court finds that the Federal Employee Plaintiffs have failed to demonstrate a likelihood of success on the justiciability of their claims, it shall not at this time address the likelihood of success on the substantive theories underlying their request for injunctive relief. *See*, *e.g.*, *Elec. Priv. Info. Ctr. v. Pres. Adv. Comm. on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017) (affirming denial of preliminary injunction where plaintiff failed to show substantial likelihood of standing).

### 2.  Service Member Plaintiffs

Although the Service Member Plaintiffs confront factual circumstances distinct from those of the Federal Employee Plaintiffs, they have also failed to show a substantial likelihood of success that their claims are justiciable.  As detailed *supra* Section I(C), the Service Member Plaintiffs' initial requests for religious accommodations to the DoD Vaccine Mandate were denied and their appeals of those denials are pending.  Beaven Decl. ¶¶ 5, 6; Jurney Decl. ¶ 7; Cerny Decl. ¶ 6.  But

similarly to the Federal Employee Plaintiffs, neither Service Member Plaintiff has been disciplined or separated from the Marine Corps.  Beaven Decl. ¶ 8; Jurney Decl. ¶ 9.  Instead, as addressed in the affidavits submitted by Defendants, the Service Member Plaintiffs have actually received temporary administrative exemptions while their appeals are pending.  Beaven Decl. ¶ 5; Jurney Decl. ¶ 9.

As with the Federal Employee Plaintiffs, the Service Member Plaintiffs' claims of harm rest on theories of injury that are speculative and contingent on their appeals being denied—an outcome that may never come to pass.  *Texas*, 523 U.S. at 300; *see* Defs.' Opp'n at 15 ("If the military grants the requests, the service members will be exempted from the COVID-19 vaccination requirement[.]").  Accordingly, for the same reasons discussed with respect to the Federal Employee Plaintiffs, the Service Member Plaintiffs have also failed to demonstrate a likelihood of success that their claims are ripe.

Additional considerations specific to the military warrant some discussion.  Defendants explain that even if the Service Member Plaintiffs' appeals are denied and they later face adverse action if they fail to get vaccinated against COVID-19, the military has "administrative appeal procedures," offering "multiple opportunities to present their arguments to the Service and for the Service to respond."  Defs.' Opp'n at 15–16.  Defendants argue that until the Service Member Plaintiffs exhaust these procedures, they cannot seek judicial relief.  *Id.*  Plaintiffs do not respond to these exhaustion arguments specific to the Service Member Plaintiffs.

The D.C. Circuit has made clear that "[c]ivilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers."  *Bois v. Marsh*, 801 F.2d 462, 478 (D.C. Cir. 1986) (quoting *Chappell v. Wallace*, 462 U.S. 296, 300 (1983)).  "This teaching reinforces the

well-established principle 'that a court should not review internal military affairs in the absence of . . . exhaustion of available intraservice corrective measures.'"  *Id.* (quoting *Mindes v. Seaman*, 453 F.2d 197, 201 (5th Cir. 1971)); *see also Sohm v. Fowler*, 365 F.2d 915, 917–18 (D.C. Cir. 1966); *Bolger v. Marshall*, 193 F.2d 37, 39 (D.C. Cir. 1951).  In sum, this Circuit recognizes a "salutary rule that an aggrieved military officer must first exhaust his administrative remedies . . . prior to litigating his claims in a federal court."  *Bois*, 801 F.2d at 468 (internal quotation marks omitted) (quoting *Knehans v. Alexander*, 566 F.2d 312, 315 (D.C. Cir. 1977)).

Granting the urgent injunctive relief sought by the Service Member Plaintiffs would require the Court to adjudicate internal military affairs before the military chain of command has had full opportunity to consider the accommodation requests at issue.  Acceding to this request would undermine the purpose of exhaustion and infringe on the military's expertise and interest in handling its own personnel matters.  *See, e.g.*, *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953) ("Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters[.]"); *Hidalgo v. FBI*, 344 F.3d 1256, 1259 (D.C. Cir. 2003) (explaining the purposes of exhaustion as "preventing premature interference with agency processes" and "affording the parties and the courts the benefits of the agency's experience and expertise").

The Service Member Plaintiffs do not dispute the availability of future administrative remedies within the military should their appeals for religious accommodations be denied.  Nor do they dispute that administrative exhaustion is required for a military plaintiff's claims to be justiciable, even where the plaintiff alleges the deprivation of a constitutional right.  *See Roe v. Dep't of Def.*, 947 F.3d 207, 218 (4th Cir. 2020) (as amended Jan. 14, 2020).  And although certain exceptions to the exhaustion doctrine apply, the Service Member Plaintiffs have advanced no argument or evidence demonstrating that obtaining review of any future discipline or removal

pursuant to ordinary military review procedures would be futile or inadequate.[24]  *See Bois*, 801

F.2d at 468.  For these reasons, the Service Member Plaintiffs have failed to demonstrate that their

claims are presently justiciable.

## B.  Irreparable Harm

The Court next considers whether Plaintiffs have demonstrated "irreparable harm."

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  To constitute

"irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical,

beyond remediation, and of such *imminence* that there is a clear and present need for equitable

relief."  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal

quotation marks and citation omitted).  And "[p]laintiffs seeking preliminary relief [must]

demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal citations omitted).  A "possibility of irreparable

harm" is not enough.  *Id.*  "[P]roving 'irreparable' injury is a considerable burden, requiring proof

that the movant's injury is 'certain, great and actual—not theoretical—and imminent, creating a

clear and present need for extraordinary equitable relief to prevent harm.'"  *Power Mobility Coal.*

*v. Leavitt,* 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669,

674 (D.C. Cir. 1985)).  The D.C. Circuit "has set a high standard for irreparable injury."

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

For the reasons set forth below, the Court finds that no Plaintiff has adequately

demonstrated a certainty of irreparable harm under the "high standard" applicable in this

---

[24] Instead, Plaintiffs rely exclusively on anecdotal evidence that one senior officer expressed in an email that Navy personnel who failed to get vaccinated would be fired, and that the Marine Corps has initiated "administrative separation" for one Marine who has refused to receive a COVID-19 vaccine.  *See* Pls.' Reply at 7; Pls.' Reply Ex. 1, Administrative Remarks, ECF No. 14-1.  Such evidence says nothing of the availability of accommodations or exceptions to the vaccine requirement.  Nor does it undermine the subsequent administrative steps available to personnel, detailed in this section.

jurisdiction.  *Id.*  This shortcoming weighs heavily against Plaintiffs' present request for emergency injunctive relief.

### 1. Special Agent Hallfrisch

The Court begins its irreparable harm analysis with Special Agent Hallfrisch.  Special Agent Hallfrisch is an employee of the Department of State and is, therefore, subject to the vaccine mandate under Executive Order 14043.  Compl. ¶ 21; *see also* 5 U.S.C. § 101.  As noted above, Special Agent Hallfrisch alleges that he is "a devout Christian who cannot in morality receive the vaccine without compromising his closely held religious beliefs."  Compl. ¶ 21.  Because of these religious beliefs, Special Agent Hallfrisch submitted a request to the Deputy Chief of Mission of his assigned post at the U.S. Embassy in Djibouti, for a religious exemption to the vaccine mandate.  *Id.* ¶ 62.  On September 29, 2021, that Deputy Chief of Mission *granted* Special Agent Hallfrisch's request for a religious exemption.  *Id.*

Given that the State Department has already provided Special Agent Hallfrisch with a religious exemption from the vaccine mandate, it is unclear precisely what "harm" he is claiming at this stage of the proceedings.  In their collective motion for emergency relief, Plaintiffs trace their putative harm to the possibility of receiving a vaccine that contravenes their religious beliefs and allegedly runs afoul of the FDCA.  *See* Pls.' Mot. at 25.  But with his religious exemption in hand, such concerns do not apply to Special Agent Hallfrisch.  *See* Compl. ¶ 62.  Put simply, Special Agent Hallfrisch has apparently received the relief he originally requested: he may continue in his role as a State Department employee, without receiving the COVID-19 vaccine to which he objects.  Under these circumstances, the Court finds no basis to conclude that Special Agent Hallfrisch faces a "certain" harm "of such *imminence* that there is a clear and present need for equitable relief."  *Mexichem*, 787 F.3d at 555; *see also Pelekai v. Hawai'i*, No. 21-CV-00343-

DKW-RT, 2021 WL 4944804, at *1 (D. Haw. Oct. 22, 2021) (explaining that plaintiffs who had received religious exemptions to a Honolulu vaccine mandate had not "been injured").

As a final point, Special Agent Hallfrisch also alleges that, notwithstanding his vaccine exemption, "President Biden and Secretary Blinken . . . have engaged in a series of retaliatory and harassing behavior [by] demanding to obtain irrelevant medical and religious information to which they are not lawfully entitled." Compl. ¶ 62. Because of this "behavior," Special Agent Hallfrisch purportedly "faces severe adverse employment action including without limitation, reprimand, loss of benefits, loss of promotional opportunity, termination of employment, and other life-altering disciplinary measures for exercising his sincerely held religious beliefs." *Id.*

The Court is unpersuaded by this conclusory allegation of irreparable harm. To begin, Special Agent Hallrisch has pointed to nothing in the record supporting his speculative assertion that he will confront any "adverse employment" action at the State Department if he does not provide certain "medical and religious" documents. In fact, Special Agent Hallfrisch does not even specify what type of information he must provide or why his failure to produce such information would lead to disciplinary measures. And regardless, Special Agent Hallfrisch offers no explanation as to why allegedly adverse employment actions at the State Department would constitute "irreparable" harm. To the contrary, such adverse employment actions traditionally *do not* qualify as irreparable harm in the preliminary injunction context. *See infra* Section III(B)(2)(b); *Moore v. Summers*, 113 F. Supp. 2d 5, 24 (D.D.C. 2000) ("It is well-settled that preliminary injunctive relief is not usually available in employment cases[.]"). Accordingly, the Court finds that Special Agent Hallfrisch's passing reference to "harassing and retaliatory" behavior and the abstract possibility of adverse employment actions, Compl. ¶ 62, also fail to meet

the "high standard" necessary to show irreparable harm, *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

### 2. Remaining Federal Employee Plaintiffs

Next, the Court turns to the remaining Federal Employee Plaintiffs and their respective claims of irreparable harm.  Like Special Agent Hallfrisch, these Federal Employee Plaintiffs work within executive departments and agencies subject to Executive Order 14043 and its vaccine mandate.  *See* Compl. ¶¶ 5–20, 22; 5 U.S.C. §§ 101, 105.  As described below, these Federal Employee Plaintiffs present two overarching sources of harm arising from Executive order 14043: (1) that receiving a COVID-19 vaccine would violate their constitutional and statutory rights, and (2) that their desire to avoid the COVID-19 vaccine will cause them "severe adverse employment actions."  *See* Pls.' Mot. at 25–27; Compl. ¶¶ 60–61, 63–77.  For the reasons set forth herein, the Court finds that neither source of putative injury meets the "high standard" necessary to establish irreparable harm.

### a. Constitutional and Statutory Harm

The Court begins with the Federal Employee Plaintiffs' claim of constitutional and statutory harm.  The Federal Employee Plaintiffs first predicate their putative constitutional injury on the right to freely exercise their Christian beliefs, which allegedly compel abstention from the COVID-19 vaccines.  *See* Compl. ¶¶ 5–20, 22; Pls.' Mot. at 25.  Relatedly, these Plaintiffs argue that their Equal Protection rights would be violated, were they forced to take a vaccine in contravention of their religious beliefs, while others were not compelled to do the same.  *See* Pls.' Mot. at 25.  As to their alleged statutory harm, the Federal Employee Plaintiffs claim that the vaccine mandate impinges upon their ability under the FDCA and RFRA to refuse all currently available COVID-19 vaccines.  *Id.*  Each of these putative harms, therefore, derives from the

*possibility* that federal agency-employers will require the Federal Employee Plaintiffs to receive a COVID-19 vaccination under Executive Order 14043.  *See* Pls.' Mot. at 25–27.

Plaintiffs' reliance on the *possibility* of inoculation impedes their claim of irreparable harm. To start, each Federal Employee Plaintiff has submitted a request for a religious exemption, which presently remains pending.  Compl. ¶¶ 60–61, 63–77.  Accordingly, no Federal Employee Plaintiff has yet been compelled to receive a vaccine in contravention of their constitutional right to religious free exercise or related statutory objections.  *See* Compl. ¶¶ 60–61, 63–77.  The record also indicates that no Federal Employee Plaintiff will be subject to discipline for refusing the vaccine during the pendency of their presently outstanding religious exemption requests.  *See* Defs.' Opp'n at 5 (citing Task Force Vaccine Guidance).  This exempted status currently allows the Federal Employee Plaintiffs to raise their religious objections to the vaccine, while also retaining their federal jobs.  Under these circumstances, the Federal Employee Plaintiffs cannot rely on the presumption of irreparable harm that attaches to First Amendment violations, *see Elrod v. Burns*, 427 U.S. 347, 373 (1976), because no such violation has yet occurred, *see* Compl. ¶¶ 5–24; 60–79.

And it is unclear if any such violation will ever occur.  An *approved* exemption request would allow the exempted federal employee to refuse the COVID-19 vaccine entirely.  Like Special Agent Hallfrisch, the exempted employee could continue in his or her federal post without receiving the vaccine and, thereby, avoid the alleged constitutional and statutory harm they now attribute to the inoculation.  For example, Plaintiffs broadly argue that forcing an individual to choose between complying with their faith or maintaining their federal employment violates constitutional and statutory rights.  Pls.' Mot. at 25–26; Pls.' Reply at 4, n.3; *see also Fulton v. City of Phila.*, 141 S. Ct. 1868, 1876 (2021).  But because the Federal Employee Plaintiffs have

pending requests for religious exemptions from the vaccine mandate, it remains uncertain whether they will ever face this supposed "ultimatum." Pls.' Mot. at 26. This uncertainty cuts against a finding of "irreparable harm." *See Tenacre Found. v. INS*, 892 F. Supp. 289, 294 (D.D.C. 1995), *aff'd*, 78 F.3d 693 (D.C. Cir. 1996) ("Plaintiff's allegations of harm to their First Amendment right to the free exercise of the Christian Science religion are, at this juncture, only speculative, and the Court cannot find that irreparable harm exists here."); *Burcham v. City of Los Angeles*, No. 2:21-CV-07296-RGK-JPR, 2021 WL 5049099, at *4 (C.D. Cal. Oct. 27, 2021) ("Defendants have accepted all . . . exemptions, and the City has agreed that employees with pending requests are currently exempt from the vaccine requirement . . . until the request is approved or denied. Therefore, Plaintiffs cannot presently establish a likelihood of imminent, irreparable harm.").

There is also nothing in the record to indicate with any certainty how quickly any individual exemption request will be resolved. Put differently, the exemption requests submitted by the Federal Employee Plaintiffs may remain pending for weeks or months, during which time those employees will retain their temporary-exempted status and avoid the prospect of required vaccination. And even if a religious exemption request was ultimately denied, the applicant would still receive a two-week buffer period before they would be required to receive their initial inoculation. *See* Task Force Vaccine Guidance. These points of temporal ambiguity call into question the "imminence" of the harm the Federal Employee Plaintiffs now face, even if their exemption requests were eventually denied. *Mexichem*, 787 F.3d at 555. This temporal uncertainty, combined with the possibility that any given exemption request may be granted outright prevents the Federal Employee Plaintiffs from establishing "irreparable" constitutional or statutory harm connected to the possibility of inoculation.

Finally, it bears mention that the exemption requests discussed above distinguish the putative harm in this case from the harm present in other cases involving COVID-19 vaccine mandates.  For example, Plaintiffs cite to *Dr. A. v. Hochul*, wherein a district court enjoined a New York state vaccine mandate for healthcare workers.  No. 1:21-CV-1009, 2021 WL 4734404, at *1 (N.D.N.Y. Oct. 12, 2021).  But there, the New York vaccine mandate under review specifically excluded religious exemptions.  *Id.* at *8.  As such, no plaintiff had the opportunity of circumventing the New York vaccine mandate on account of a sincerely held religious belief. Plaintiffs also cite to *Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728 (6th Cir. 2021), a case in which a district court enjoined a university vaccine mandate for college-athletes.  In *Dahl*, the university's vaccine mandate did provide for religious exemptions, but the plaintiff-athletes came before the district court *after* the university had denied their exemption requests and *after* the university indicated that unvaccinated student athletes would be excluded from intercollegiate sports.  *Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 1:21-CV-757, 2021 WL 3891620, at *1–2 (W.D. Mich. Aug. 31, 2021).

The case at hand is distinct from both *Dr. A* and *Dahl*.  Unlike *Dr. A*, Plaintiffs here were able to file for religious exemptions to the vaccine mandate they now challenge.  *See* Compl. ¶¶ 60–61, 63–77.  And unlike in *Dahl*, the Federal Employee Plaintiffs here seek emergency injunctive relief *before* they have received a final decision on those exemption requests and while they also remain in their jobs under temporary-exempted status.  *See id.*  For these reasons, the plaintiffs in this case come before the Court with a much more speculative claim of constitutional or statutory harm than did the plaintiffs in either *Dr. A* or *Dahl*.[25]  And, as explained forth above,

---

[25] This case is also readily distinguishable from *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), to which Plaintiffs cite.  That case did not involve a vaccine mandate, but rather a New York restriction on indoor gatherings, which applied to certain places of worship, but not comparable secular

this uncertainty directly inhibits their attempt to establish an irreparable constitutional or statutory injury.

### b. Employment Harm

The Federal Employee Plaintiffs also point to the possibility of adverse employment actions as a source of "imminent" and "severe" harm.  *See* Compl. ¶¶ 60–61, 63–77.  Here, the Federal Employee Plaintiffs allege that because of their attempts to exercise their religious beliefs, they are now under threat of "reprimand, loss of benefits, loss of promotional opportunity, termination of employment, and other life-altering disciplinary measures."  *Id.*

This theory of employment-based harm comes up short.  In *Sampson v. Murray*, the Supreme Court held "that loss of employment is not irreparable harm except in a 'genuinely extraordinary situation.'"  *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 29 (D.D.C. 2020) (quoting 415 U.S. 61, 92 n.68 (1974)).  Subsequent courts have duly applied the rule in *Sampson* to claims of employment-based harm, emphasizing that courts possess sufficient equitable authority to "remedy [the] loss in employment through, for example, back pay and time in service credit." *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006).  Accordingly, "cases are legion holding that loss of employment does not constitute irreparable injury."  *Id.*; *see also Gilliard v. McWilliams*, 315 F. Supp. 3d 402, 417 (D.D.C. 2018) ("[L]oss of employment is not legally irreparable."). Alternative forms of adverse employment action, such as the loss of benefits or promotional opportunities, are also generally insufficient to constitute irreparable harm.  *See Fraternal Ord. of Police Libr. of Cong. Lab. Comm. v. Libr. of Cong.*, 639 F. Supp. 2d 20, 24 (D.D.C. 2009) (concluding that "denial of training, loss of promotion opportunities, forced retirement, placement into civilian rather than officer positions" were not beyond remediation).

---

facilities.  *Id.* at 66.  Moreover, the petitioners in that case did not have the opportunity to apply for any sort of exemption to the gathering limitations they challenged.

Here, the Federal Employee Plaintiffs have not demonstrated any "extraordinary circumstances" that would render their putative employment-based injuries "irreparable." While these Plaintiffs colorfully label their potential adverse employment actions as "imminent," "severe," and "life-altering," *see* Compl. ¶¶ 60–61, 63–77, none of the Federal Employee Plaintiffs have offered an explanation regarding the specific adverse employment actions they actually face, *see* Pls.' Mot. at 25–27; Pls.' Reply at 2–7. This makes sense, given that each Federal Employee Plaintiff has an exemption request pending, during which time they are not subject to disciplinary action for their vaccine refusals. *See* Task Force Vaccine Guidance; *Williams v. Brown*, No. 6:21-CV-01332-AA, 2021 WL 4894264, at *10 (D. Or. Oct. 19, 2021) ("Those Plaintiffs have failed to demonstrate a likelihood of irreparable harm . . . because the prospect of termination is entirely speculative."). And even if a Federal Employee Plaintiff did ultimately face employment discipline, these Plaintiffs provide no arguments as to why such adverse action could not be adequately remedied through more traditional relief, such as back-pay or reinstatement. *Fraternal Ord. of Police Libr. of Cong. Lab. Comm.*, 639 F. Supp. 2d at 24. Because of these shortcomings, the Court finds that none of the Federal Employee Plaintiffs have demonstrated a certain employment-based injury, which would be "beyond remediation" absent immediate injunctive relief. *Mexichem*, 787 F.3d at 555.

### 3. Service Member Plaintiffs

Finally, the Court addresses the claim of irreparable harm presented by the two Service Member Plaintiffs, First Lieutenant Soto and Corporal Hall. Both Service Member Plaintiffs are on active duty in the United States Marine Corps. *See* Beaven Decl. ¶ 3; Jurney Decl. ¶ 4. The Service Member Plaintiffs are, therefore, subject to DoD Vaccine Mandate. *See* Compl. ¶¶ 23–24. More specifically, because the Service Member Plaintiffs are active-duty Marines, they are subject to the vaccine directive issued by the Secretary of the Navy to implement the DoD

Vaccine Mandate.  *See* Furness Decl. ¶ 3.  That Navy directive requires active-duty Sailors and Marines "who are not already vaccinated, exempted, or currently seeking an exemption, to be fully vaccinated with an FDA-approved COVID-19 vaccine . . . by November 28, 2021."  *Id.* ¶¶ 3–4.

Like the Federal Employee Plaintiffs, the Service Member Plaintiffs contend that the military vaccine mandate will cause them irreparable harm (1) by violating their constitutional and statutory rights, and (2) by causing them to suffer adverse employment actions within the military. *See* Compl. ¶¶ 78–79; Pls.' Mot. at 25–27.  Additionally, the Service Member Plaintiffs assert that the military vaccine mandate will cause irreparable harm by impeding military readiness.  *See* Pls.' Mot. at 26–27.  As set forth below, the Court finds that each source of putative injury falls short of establishing an "irreparable harm."

### a.  Constitutional and Statutory Harm

Like the Federal Employee Plaintiffs, the Service Member Plaintiffs' claim of an irreparable constitutional or statutory violation is tied directly to the threat of involuntary vaccination.  *See* Compl. ¶¶ 78–79; Pls.' Mot. at 25–27.  The Service Member Plaintiffs also claim sincere religious beliefs, which "compel [them] to abstain from receiving any of the currently available COVID-19 vaccines."  Compl. ¶¶ 78–79.  Relatedly, the Service Member Plaintiffs argue that their Equal Protection rights would be violated, were they forced to take a vaccine in contravention of their religious beliefs, while others were not compelled to do the same.  *See* Pls.' Mot. at 25; Compl. ¶ 187.  The Service Member Plaintiffs further claim the ability under the FDCA and RFRA to refuse all currently available COVID-19 vaccines.  Pls.' Mot. at 25.  Accordingly,

the Service Member Plaintiffs argue that compelled inoculation would irreversibly violate these constitutional and statutory rights, causing them to suffer "irreparable harm."  *See id.* at 25–27.

The Service Member Plaintiffs' claim of constitutional and statutory harm runs into the same impediments faced by the Federal Employee Plaintiffs.  To start, neither First Lieutenant Soto nor Corporal Hall has been compelled to receive the vaccine, allegedly in contravention of their First Amendment rights.  *See* Compl. ¶¶ 78–79.  To the contrary, they are presently being afforded the opportunity to freely assert their religious opposition to the vaccine, without facing discipline.  Beaven Decl. ¶¶ 5–8; Jurney Decl. ¶¶ 6–9.  And, as explained below, it remains uncertain whether they will ever face the imminent prospect of compelled inoculation at all. Accordingly, neither of the Service Member Plaintiffs currently present an actualized First Amendment violation that would presumptively satisfy the irreparable harm element of the preliminary injunction and TRO analysis.  *See Elrod*, 427 U.S. at 373; *Chaplaincy of Full Gospel Churches*, 454 F.3d at 300.

This uncertainty derives from the fact that First Lieutenant Soto and Corporal Hall have applied for religious exemptions to the Navy's vaccine requirement.  *See* Beaven Decl. ¶ 5; Jurney Decl. ¶ 7.  To be sure, the Deputy Commandant for Manpower and Reserve Affairs initially denied both the Service Member Plaintiffs' exemption requests on September 29, 2021 and October 19, 2021, respectively.  *See* Beaven Decl. ¶ 5 (Cpl. Hall denial); Jurney Decl. ¶ 7 (1st Lt. Soto denial). But that does not render those denials final.  To the contrary, "[i]f the request for religious accommodation for immunization is disapproved, [a] service member has the right to request an appeal to the Commandant of the Marine Corps."  Furness Decl. ¶ 12.b (citing Marine Corps Order 1730.9 ¶ 4(c)(1)).  And here, both First Lieutenant Soto and Corporal Hall have appealed their exemption denials and those appeals remain pending.  *See* Cerny Decl. ¶¶ 4–6.

Moreover, the record indicates that the Service Member Plaintiffs have received a temporary administrative exemption from the vaccine mandate while theirs appeals are pending. *See* Beaven Decl. ¶ 5; Furness Decl. ¶ 12(a) n.7 ("No disciplinary or administrative action will be initiated while a request for an exemption for religious accommodations is pending."). There is also limited certainty in the record about how long the Service Member Plaintiffs' appeals will remain pending, and when they would actually face the prospect of compelled vaccination requirement if their appeals were eventually denied. *See* Furness Decl. ¶¶ 13–23 (describing multi-step military appeals and disciplinary process).

For these reasons, the Court finds that the Service Member Plaintiffs' claim of constitutional and statutory injury is speculative and not clearly imminent. *Mexichem*, 787 F.3d at 555. The Service Member Plaintiffs may well receive a favorable determination in their pending appeals. Upon receiving such a result, neither Service Member Plaintiff would need to receive the COVID-19 vaccine to which they now trace their putative constitutional and statutory harm. And in the interim, the Service Member Plaintiffs enjoy a temporary exempted status, which allows them to retain their positions without receiving the vaccine or facing discipline. *See* Beaven Decl. ¶ 5; Furness Decl. ¶ 12(a) n.7. Thus, neither Service Member Plaintiff presently confronts an imminent choice between adhering to their religious beliefs or retaining their military post. *Compare Fulton v. City of Phila.*, 141 S. Ct. 1868, 1876 (2021); *see also supra* Section III(B)(2)(a) (distinguishing COVID-19 cases). In fact, it remains unclear whether either First Lieutenant Soto or Corporal Hall will ever face such an "ultimatum." Pls.' Mot. at 26. The Court, therefore, finds that the Service Member Plaintiffs have not demonstrated irreparable harm through their putative constitutional and statutory injuries. *See Burcham*, 2021 WL 5049099, at *4 (finding no irreparable harm where vaccine mandate exemption requests were pending).

### b. Employment Harm

The Service Member Plaintiffs also contend that they will "suffer irreparable harm" because of the "severe adverse employment action" they might face if they fail to receive a COVID-19 vaccine. Compl. ¶¶ 78–79. Like the Federal Employee Plaintiffs, the Service Member Plaintiffs claim that, absent compliance with the vaccine mandate, they will confront "reprimand, loss of benefits, loss of promotional opportunity, termination of employment, and other life-altering disciplinary." *Id.*; *see also* Pls.' Mot. at 27 (discussing the "threat to terminate . . . military heroes").

The Service Member Plaintiffs' theory of employment-based irreparable harm falls short. In the context of "military personnel decisions, . . . courts have held that the showing of irreparable harm must be *especially strong* before an injunction is warranted, given the national security interests weighing against judicial intervention in military affairs." *Shaw v. Austin*, No. CV 20-2036 (RDM), 2021 WL 1840397, at *9 (D.D.C. May 7, 2021) (emphasis added) (collecting cases). And here, the Service Member Plaintiffs present demonstrably abstract assertions of adverse personnel decisions befalling them in the Navy. First, these Plaintiffs offer no specifics in either their complaint or briefing about the imminent adverse employment actions they face. *See, e.g.*, Compl. 78–79; Pls.' Mot. at 25–27 (vaguely mentioning a general "threat to terminate"). Moreover, the full record before the Court belies the assertion that either Service Member Plaintiff faces an imminent threat of military discipline. *See* Jurney Decl. ¶ 9 (explaining that no "adverse administrative action or disciplinary action has been initiated against" First Lieutenant Soto); Beaven Decl. ¶ 8 ("At this time, the command has not initiated any adverse administrative or disciplinary action in the case of Cpl Hall."). And finally, even if the Service Member Plaintiffs did ultimately face some form of adverse employment action, like military discharge or a delayed

promotion, the weight of authority indicates that such employment-based harm is not irreparable. *See Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986); *Reinhard v. Johnson*, 209 F. Supp. 3d 207, 220 (D.D.C. 2016); *see also supra* III(B)(2)(b).

For these reasons, the Court finds that the Service Member Plaintiffs' alleged employment-based injuries do not constitute "irreparable harm," particularly given the heightened standard applicable in the context of military personnel decisions.

### c.  Military Readiness

Finally, the Service Member Plaintiffs raise generalized concerns pertaining to military readiness and suicide rates in the armed forces.  *See* Pls.' Mot. at 26–27; Compl. ¶¶ 78–79. Notably, the Service Member Plaintiffs argue that by mandating COVID-19 vaccines for military personnel, the DoD Vaccine Mandate impairs military readiness and, therefore, places "the entire U.S. population . . . squarely in harm's way."  Pls.' Mot. at 26.

These generalized claims regarding military readiness and suicide rates in the military fail to show how the Service Member Plaintiffs *themselves* will suffer "irreparable harm" absent injunctive relief.  Although matters of military readiness and suicide rates are certainly significant, the record does not specifically connect these potential harms in any way to the Service Member Plaintiffs, or any Plaintiff for that matter.  Abstract harm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court.  *See Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) ("[I]njuries to third parties are not a basis to find irreparable harm."); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012) (holding argument about irreparable harm "fails because it shows irreparable harm not to [plaintiff], but to third parties").  Moreover, the Court finds that the Plaintiffs' generalized

assertions about the relationship between vaccine mandates, suicide rates, and military readiness are notably speculative. For these reasons, Plaintiffs' generalized claims regarding military readiness and suicide rates in the military fail to show irreparable harm.

## C. Balance of Harms and Public Interest

"The final two factors the Court must consider when deciding whether to grant a preliminary injunction [or a temporary restraining order] are the balance of harms and the public interest." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013). Where, as here, the government is a party to the litigation, these two factors merge and are "one and the same, because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). "Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can also flow from enjoining an activity, and the public may benefit most from permitting it to continue." *Sierra Club*, 990 F. Supp. 2d at 41. Therefore, when "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Here, the public's interest in military readiness and efficient administration of the federal government outweighs Plaintiffs' speculative claims of job-related, pecuniary loss.

As discussed *supra* Section III(A), Plaintiffs' claim that the Vaccine Mandates will "strip Plaintiffs of their abilities to receive (or even request) exemption and accommodation," Pls.' Reply at 27, is, at most, speculative. Plaintiffs' own Complaint recognizes that the government's efforts to address requests for religious exemptions to the Vaccine Mandates are ongoing. *See, e.g.*, Compl. ¶¶ 60–79. As such, Plaintiffs' central interest is most accurately construed as a pecuniary interest in federal employment while their exception requests are pending. A number of courts

have already concluded that a pecuniary employment interest is insufficient to outweigh the compelling governmental interest in stemming the spread of COVID-19 via a vaccine mandate.[26] Given that the prospect of an adverse employment action is even more remote in this case, Plaintiffs' pecuniary interest is all the weaker when balanced against the public's interest in public health, military readiness, and efficient administration of the federal government.

The government has amply demonstrated that military readiness and unit cohesion would be unacceptably harmed should the Court preliminarily enjoin the DoD Vaccine Mandate. Although "[m]ilitary interests do not always trump other considerations," the Court must nevertheless "give deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter*, 555 U.S. at 11. Here, the Secretary of Defense has "determined that mandatory vaccination against [COVID-19] is necessary to protect the Force and defend the American people." Defs.' Opp'n at 36 (quoting DoD Vaccine Mandate). Plaintiffs insist that this determination is unfounded and claim that the vaccination status of service members has been "irrelevant for nearly two years, yet for unknown reasons is purportedly relevant today." Pls.' Reply at 12. Not so. The DoD's professional military judgments are supported by a lengthy record replete with data demonstrating the necessity of a general vaccine mandate. For example, Major Scott Stanley, PhD declares under penalty of perjury that nearly "90,000 service members," "impact exercises, deployments, and other global force management activities," were frustrated by DoD's March 25, 2020 stop movement order. Defs.' Opp'n Ex. 11, Declaration of Major Scott Stanley ("Stanley Decl.") ¶ 6, ECF No. 13-11. Indeed, without vaccinations, COVID-19 rendered an entire aircraft carrier non-operational.

---

[26]  *E.g.*, *Beckerich v. St. Elizabeth Med. Ctr.*, --- F. Supp. 3d ---, 2021 WL 4398027 at *7 (E.D. Ky. Sept. 24, 2021); *Harsman v. Cincinnati Children's Hosp. Med. Ctr.*, No. 21-597, 2021 WL 4504245 at *4 (S.D. Ohio Sept. 30, 2021); *Bauer v. Summey*, --- F. Supp. 3d ---, 2021 WL 4900922 at *18 (D.S.C. Oct. 21, 2020).

*Id.* ¶ 8.  The record shows that DoD weighed these and other considerations during consultations across the service branches.  *See* Defs.' Opp'n Ex. 2, FRAGO to HQDA EXORD COVID-19 Steady State Operations ¶ 3.B.3; Defs.' Opp'n Ex. 10, Mem. for Dep't of Airforce Commanders at 1.  The Court will not disturb these well-founded military judgments.  *See Winter*, 555 U.S. at 24–25.  Doing so would "pose[] a substantial threat to [the public's interest in] military discipline [that is] essential to the effective functioning of our Nation's Armed Forces."  *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986) (citing *Chappell v. Wallace*, 462 U.S. 296, 299–300 (1983)).  As such, the Court concludes that the public's interest in military readiness outweighs the interests claimed by Plaintiffs.[27]

Plaintiffs' claimed interests fare no better when compared to the public's interest in the efficient administration of the federal government and public health more broadly.  Enjoining the Federal Employee Vaccine Mandate could risk sickening swathes of the civil service, prolonging remote work, impeding public access to government benefits and records, and slowing governmental programs.  Civilian employees who continue to telework do not live in a vacuum.  Enjoining the mandatory vaccination requirements of Executive Order 14043 risks not only the health of federal agency employees, but also the health of those around them.  And courts have consistently held over the past two years that the public interest in "[s]temming the spread of COVID-19" is weighty.  *See, e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).[28]  These interests are not outweighed by the Plaintiffs' pecuniary interests.  On the

---

[27] *Cf. Order at 6, Robert v. Austin*, No. 1:21-cv-2228, ECF No. 12 (D. Colo. Sept. 1, 2021) ("It suffices for current purposes to conclude that Plaintiffs have not carried their burden of establishing that allowing members of the military who have had COVID-19 to abstain from taking a vaccine if they wish to do so is in the public interest.").

[28] *See also, e.g.*, *Johnson v. Brown*, No. 3:21-cv-1494, 2021 WL 4846060 at *26-27 (D. Or. Oct. 18, 2021); *Am.'s Frontline Drs. V. Wilcox*, No. 21-1243, 2021 WL 4546923 at *8 (C.D. Cal. July 30, 2021); *Tigges v. Northam*, 473 F. Supp. 3d 559, 574 (E.D. Va. July 21, 2021).

whole, the balance of the equities weighs against granting Plaintiffs' request for a TRO or preliminary injunction.

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court concludes that Plaintiffs have failed to carry their burden of demonstrating a substantial likelihood of success that their claims are justiciable, a certainty of irreparable harm, or that the balance of hardships and the public interest weigh in Plaintiffs' favor.  Accordingly, the Court will **DENY** their [5] Emergency Application for a Temporary Restraining Order and Preliminary Injunction.

An appropriate Order accompanies this Memorandum Opinion.

**Dated**: November 8, 2021

                    _____/s/_____
                    COLLEEN KOLLAR-KOTELLY
                    United States District Judge